**BURSOR & FISHER, P.A.**
Julia K. Venditti (State Bar No. 332688)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC**
Adrian Gucovschi*
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Email: adrian@gr-firm.com

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAURICIO GONZÁLEZ VALOIS and KELLEY THIEME, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INVOCA, INC.,<br><br>Defendant. | Case No. 3:24-cv-05542-JD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Mauricio González Valois and Kelley Thieme (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Invoca, Inc. ("Defendant" or "Invoca"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Invoca developed and operates a conversation intelligence software-as-a-service ("SaaS") that it sells to, and partners with, third party businesses (such as DirecTV) so that those business can "optimize the [consumers'] buying journey to drive more revenue."[1] This conversation intelligence SaaS derives data-driven insights from telephone conversations between third party businesses and their consumers. Specifically, a caller's speech is recorded and then transcribed using natural language processing ("NLP"), so that artificial intelligence ("AI") can "read" it, identify patterns, and classify the data. The result is that every DirecTV consumer's telephone conversation is surreptitiously transmitted to Invoca's servers, where it is processed and analyzed using Invoca's AI and NLP, and thereafter presented to Invoca's clients in dashboards, searchable transcripts, and reports. By doing so, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, and 637.5.

2. Invoca's conversation intelligence SaaS includes several services ("Services"), including, *inter alia*, Signal AI Studio; Automated Quality Assurance; Signal AI Discovery; Call Recordings and Transcriptions; and Conversational IVR (Interactive Voice Response). Third party businesses such as DirecTV employ Defendant's Services.

3. By employing the Services, DirecTV has aided, agreed with, employed, and/or permitted Invoca to monitor, read, record, learn the contents of, or otherwise intercept the conversations of their current and prospective consumers without their consent. These consumers include individuals who call DirecTV (*i.e.*, their customer service line) from within the State of

[1] https://www.invoca.com/company/about.

California to, among other things, retrieve information, schedule service appointments, make changes to subscriptions, and receive additional forms of customer support.

4. Unbeknownst to consumers, when they contact and speak with businesses such as DirecTV, Invoca eavesdrops and records these conversations to which it is not a party. By partnering with third party businesses and deploying its Services, Invoca collects a trove of data from telephone conversations between businesses (in this case, DirecTV) and their consumers.

5. Invoca needs access to this data to provide the Services' features (including, *inter alia*, call recording, call transcription, and analysis thereof) described *infra*. Thus, Invoca records, accesses, reads, and learns the contents of conversations between Californian residents, on the one hand, and businesses including but not limited to DirecTV, on the other hand.

6. Crucially, neither DirecTV nor Invoca procured the consent of any person who interacted with DirecTV, prior to Invoca recording, accessing, reading, and learning the contents of conversations between California residents and DirecTV.

7. For instance, DirecTV consumers are told that their calls will be "recorded for quality assurance." However, there is no disclosure that consumers' calls will also be shared with Invoca, an unknown third party, for purposes unrelated to quality assurance and/or training. This lack of consent is particularly troublesome given that Invoca has the capability to use the contents of those conversations for purposes other than simply relaying the same to DirecTV.

8. Plaintiffs bring this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages from Defendant for failing to comply with the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, and 637.5.

## PARTIES

9. Plaintiff Mauricio González Valois resides in San Francisco, California, intends to remain there, and is, therefore, a citizen of California. Mr. González Valois was in California when he called DirecTV's customer service line in or around 2024. Mr. González Valois reasonably expected that his conversation with DirecTV was only between himself and DirecTV. Mr. González Valois was not aware, nor did he have any reason to suspect, that his phone call was being surreptitiously transmitted to an unknown third party software analytics provider: Invoca.

10. Nonetheless, Invoca, through the Services, eavesdropped on Mr. González Valois's entire conversation with DirecTV. Specifically, Invoca, through the Services, recorded and transcribed Mr. González Valois's conversation in real time, and performed AI analysis thereon. Through this process, Invoca read, learned, and used the contents of Mr. González Valois's conversation with DirecTV in real time. Both Invoca and DirecTV failed to inform Mr. González Valois, prior to recording: (i) that a third party, Invoca, was listening in on his communications with DirecTV, (ii) that a third party, Invoca, was tapping or otherwise making an unauthorized connection with Mr. González Valois's telephone conversation using the Services, and (iii) that the contents of Mr. González Valois's confidential communications with DirecTV were being recorded, collected, intercepted, and analyzed by a third party, Invoca, using the Services. Nor did Mr. González Valois consent for the contents of his communications to be used for purposes other than DirecTV's quality assurance and training purposes, such as Invoca's marketing analytics, AI development, and industry reports, amongst other uses, as discussed *infra*. Therefore, Mr. González Valois did not consent to Invoca intercepting or recording his calls to DirecTV, nor did he consent to the contents of his communication to be used by DirecTV or Invoca for the full scope of the Services or Invoca's other uses of the call recordings.

11. Plaintiff Kelley Thieme resides in San Francisco, California, intends to remain there, and is, therefore, a citizen of California. Ms. Thieme was in California when she called DirecTV's customer service line on several occasions during the relevant time period, including in or around December of 2025 and/or February of 2026. Ms. Thieme reasonably expected that her conversation with DirecTV was only between herself and DirecTV. Ms. Thieme was not aware, nor did she have any reason to suspect, that her phone call was being surreptitiously transmitted to an unknown third party software analytics provider: Invoca.

12. Nonetheless, Invoca, through the Services, eavesdropped on Ms. Thieme's entire conversation with DirecTV. Specifically, Invoca, through the Services, recorded and transcribed Ms. Thieme's conversation in real time, and performed AI analysis thereon. Through this process, Invoca read, learned, and used the contents of Ms. Thieme's conversation with DirecTV in real time. Both Invoca and DirecTV failed to inform Ms. Thieme, prior to recording: (i) that a third party,

Invoca, was listening in on her communications with DirecTV, (ii) that a third party, Invoca, was tapping or otherwise making an unauthorized connection with Ms. Thieme's telephone conversation using the Services, and (iii) that the contents Ms. Thieme's confidential communications with DirecTV were being recorded, collected, intercepted, and analyzed by a third party, Invoca, using the Services. Nor did Ms. Thieme consent for the contents of her communications to be used for purposes other than DirecTV's quality assurance purposes, such as Invoca's marketing analytics, AI development, and industry reports, amongst other unauthorized uses, as discussed *infra*. Therefore, Ms. Thieme did not consent to Invoca intercepting or recording her calls to DirecTV, nor did she consent to the contents of her communication to be used by DirecTV or Invoca's other uses of the call recordings.

13. Accordingly, Plaintiffs have had their privacy invaded due to Invoca's violations of CIPA alleged herein.

14. Defendant Invoca, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action where there are more than 100 members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and many members of the proposed Class are citizens of a state different from Defendant.

16. The Court has personal jurisdiction over Defendant because Defendant is headquartered, and maintains its principal place of business, in California. Additionally, Plaintiffs submit to the jurisdiction of the Court.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District, and because a substantial portion of the events, omissions, and acts giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I. Background On The California Invasion Of Privacy Act

18. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

19. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

20. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

21. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

22. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

23. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

24. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. *See* Cal. Penal Code § 637.2(a)(1). Plaintiffs do so here against Invoca.

## II. Defendant Violates California Law

25. Invoca is a "leader in Conversation Intelligence AI."[2] "Conversation intelligence solutions … derive data-driven insights from conversations between [a] call center and customers."[3] Specifically, "Conversation intelligence extracts usable data from human speech and conversation using natural language processing (NLP) to allow computers to 'understand' speech and artificial intelligence (AI) to extract and organize data from it. In order for the algorithm to analyze speech, it is recorded then transcribed so the AI can 'read' it, identify patterns, and classify the data. The result is that every conversation is captured and the data that matters most to [a] business is visualized in dashboards, searchable transcripts, [and] reports."[4] This allows contact centers to "[b]oost conversion rates, customer satisfaction, and operational efficiency."[5]

26. Invoca's conversation intelligence software-as-a-service ("SaaS") includes several services such as Signal AI Studio; Automated Quality Assurance; Signal AI Discovery; Call Recordings and Transcriptions; and Conversational IVR (Interactive Voice Response).

27. Signal AI Studio is "[p]owered by patented machine learning" and allows Invoca clients to "create AI models trained on [their] business's calls that capture the intent, product/service

---

[2] https://www.invoca.com/company/about.

[3] https://www.invoca.com/product/conversation-intelligence.

[4] https://www.invoca.com/product/conversation-intelligence.

[5] https://www.invoca.com/solutions/contact-centers.

interest, and conversion outcome of every conversation."[6] Signal AI Studio "automatically analyzes every call to [a] business, mapping conversations into themes and topics … [One] simply tell[s] it the insight [they] want to measure, and Signal AI Studio shows [] transcribed examples from [] calls that either fit or don't fit that insight."[7]

28. Invoca labels these insights as "Signals" and states that "In-call Signals [c]an include information about what took place in [a] phone call itself, including the duration of the call, words or phrases spoken during the conversation."[8] Thus, Signal AI Studio can measure, *inter alia*:

- Caller Intent: Detect if the caller is a sales lead, current customer, new or existing patient, or job seeker;
- Caller Interest: Determine the specific product or service the caller is interested in, if they are looking for help with an online order, or need support with a product issue;
- Conversation Outcome: Detect if the caller made a purchase, booked an appointment, received a quote, or canceled a service;
- Call Events: Discover important events like if the caller asked to be called back or to speak to a supervisor; and
- Voice of the Customer (VoC) Insights: Detect if the caller asked about pricing or a specific product feature, discussed a competitor, or lodged a complaint.[9]

29. Automated Quality Assurance is a means of conducting contact center "[a]gent call scoring and coaching — supercharged with AI. Signal AI analyzes 100% of calls to identify the specific agent and score their performance for [] exact KPIs [(Key Performance Indicators)]."[10] Specifically, it can "[u]nderstand what tactics help and hurt call outcomes[, t]rack caller and agent sentiment throughout every call[, and i]mprove conversion rates by coaching agents in the exact areas they need to improve."[11] This allows Invoca clients to "[e]valuate 100% of inbound calls[,

[6] https://www.invoca.com/product/artificial-intelligence.

[7] https://www.invoca.com/product/signal-ai-studio.

[8] https://community.invoca.com/t5/invoca-overview/basic-knowledge-signals/ta-p/572.

[9] https://www.invoca.com/blog/signal-ai-studio.

[10] https://www.invoca.com/product/artificial-intelligence.

[11] *Id.*

m]ov[ing] from manually scoring a fraction of customer interactions to automatically scoring all of them[ and] … the entire call."[12]

30. Signal AI Discovery "is [] for marketers who want the customized insights of Signal AI, but don't necessarily know where to start or what to look for."[13] It allows Invoca clients to "[l]earn new and unexpected insights from thousands of calls at once" through "unsupervised machine learning [that] analyzes every conversation to surface … trends, topics, and issues occurring on calls."[14] Invoca explains that Signal AI Discovery can "[d]rill down into topics and listen to sample call recordings, see most common spoken words, and view a wealth of marketing data."[15]

31. Call Recordings and Transcriptions provides "a searchable database of every call recording and transcript for deep insights into [] consumers, call handling, and more."[16] Per its website, "Invoca begins recording as soon as [a] call connects — and stays on the call no matter where it's transferred to — to capture the complete caller experience, every time."[17]

32. In addition, Invoca provides a "searchable database of every call transcribed with best-in-class accuracy by generative AI[ and allows for the r]eview [of] transcripts for unique insights into [] consumers, products, competitors, call experiences, and more."[18] Technically, Invoca explains that its "transcription engine powered by generative AI LLMs (large language models) turns call recordings into text with unmatched precision," "neural network models track the sentiment of callers and agents throughout every call," and "AI-powered named entity recognition (NER) automatically identifies and extracts words and terms spoken on a call, storing it in Invoca as structured, actionable data."[19]

---

[12] https://www.invoca.com/product/automated-quality-assurance.

[13] https://community.invoca.com/t5/conversation-analytics/signal-ai-automatically-analyze-and-detect-signal-topics-using/ta-p/663.

[14] https://www.invoca.com/product/artificial-intelligence.

[15] https://www.invoca.com/product/signal-discovery.

[16] https://www.invoca.com/product/call-recordings-and-transcriptions.

[17] https://www.invoca.com/product/call-recordings-and-transcriptions.

[18] https://www.invoca.com/product/artificial-intelligence.

[19] https://www.invoca.com/blog/signal-ai-launch.

33. Conversational IVR (interactive voice response) "automates interactions between a computerized system and a business's callers. It gathers information from the callers and then directs them to the correct internal menu option or live support team member depending on what the customers need."[20] "Invoca's IVR is powered by natural language processing (NLP) and can recognize both keypress and voice responses. Once the system has figured out why the customer has called, they can either continue to be assisted with the IVR system or be directed to a live customer service representative."[21] The system "route[s] leads to the best agents and locations to assist them," "[r]educe[s] agent and location call handling times," and can be used to "answer questions, survey customers, and collect data from callers, such as their preferred phone number, date of birth, or day and time for an appointment."[22] Callers' "IVR responses and interaction data [is viewable] in Invoca reports."[23]

34. When Invoca uses the Services on a phone conversation, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, Invoca—a separate and distinct third-party entity from the parties to the conversation—uses the Services to eavesdrop upon, record, extract data from, and analyze a conversation to which it is not a party. This is because Invoca itself is collecting the content of any conversation. That data is then analyzed by Invoca in the manner alleged above before being provided to any entity that was a party to the conversation (like DirecTV).

35. Invoca has the capability to use the contents of conversations it collects through Services for its own purposes and purposes beyond simply furnishing recordings to its clients such as DirecTV.

36. Indeed, Invoca can perform comprehensive analysis on the calls it eavesdrops upon, including identifying the category of the speaker and ascertaining the intent of the call.

37. Further, in its "Security, Compliance, and Data Privacy" notice, Invoca explains that "Invoca stores calls and call transcripts for internal queries … for approximately 26 months …

---

[20] https://www.invoca.com/blog/7-ivr-use-cases-marketing-sales-support-teams.

[21] *Id.*

[22] https://www.invoca.com/product/conversational-ivr.

[23] *Id.*

Invoca makes call recordings and call transcripts available to customers in the platform for 25 months."[24]

38. Invoca states in its Privacy Policy that it uses "Personal Data"—which includes "[i]nformation about your calls to use, including phone numbers and recordings"—to, among other things: (i) "improve, operate, maintain, and, in some cases, market the Invoca Platform and our Services"; (ii) to "conduct internal research in order to enhance the Invoca Platform and Services"; and (iii) to "keep you up to date on the latest Invoca Platform and Services announcements, special offers, and other information."[25]

39. Similarly, the "Invoca Terms of Service" provide:

> Client Data … Client grants to Invoca, its Affiliates and applicable contractors a worldwide, non-exclusive, transferable, royalty free license to use … Client Data, as reasonably necessary for Invoca to provide and *enhance* [*i.e.*, improve] *its provision of Services*.[26]

40. These same Terms of Service also allow Invoca to use the recorded information "to optimize and improve Services or otherwise operate Invoca's business."[27]

41. Thus, Invoca has the capability to use the wiretapped data it collects through the Services to, *inter alia*, provide, run, personalize, improve, operate, maintain, and market its products and services, and to conduct performance reporting.

42. Invoca knows that consumers of DirecTV are unaware Invoca is monitoring, recording, and/or analyzing their conversations. Nonetheless, Invoca violates consumers' privacy rights, without the requisite consent, in pursuit of profit.

## CLASS ALLEGATIONS

43. **Class Definition:** Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23. The classes Plaintiffs seek to represent are defined as follows:

---

[24] https://www.invoca.com/data-privacy-security-compliance.

[25] https://www.invoca.com/privacy-policy; *see also id.* (defining "Personal Data" as including "[i]nformation about your calls to use, including phone numbers and recordings."

[26] https://www.invoca.com/dt-terms-of-service (emphasis added).

[27] *Id.*

(a) **Nationwide Class:** Plaintiffs seek to represent a class of all United States residents who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, called DirecTV customer service agents and whose oral communications were intercepted and/or recorded by Invoca (the "Nationwide Class").

(b) **California Class:** Plaintiffs seek to represent a class of all California residents who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, called DirecTV customer service agents and whose oral communications were intercepted and/or recorded by Invoca (the "California Class").

44. The Nationwide Class and the California Class shall collectively be referred to as the "Class."

45. Plaintiffs reserve the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

46. The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

47. **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Classes as named Plaintiffs. Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's records.

48. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631, 632, and 637.5; whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiffs and members of the Classes; and whether Plaintiffs and members of the Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

49. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Classes because the named Plaintiffs, like all other members of the Classes, called DirecTV telephone lines and had the content of their communications read, learned, analyzed, and/or examined by Invoca.

50. **Adequate Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

51. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's

liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

52. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

53. Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Class and California Class against Defendant.

54. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

55. To establish liability under CIPA § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

56. The Services are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

57. Invoca is a separate legal entity from DirecTV that offers "'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Invoca was a third party to any communication between Plaintiffs and members of the Class, on the one hand, and DirecTV, respectively, on the other. *Id.* at 521; *see also Flowers v. Twilio, Inc.*, 2016 WL 11684603, at *1 (Cal. Super. Ct. Aug. 2, 2016) ("[T]he complaint makes clear that it is Twilio, not its clients, that recorded the communications … The allegations are not, as Twilio asserts, that Twilio simply provided a software product that third parties misused.").

58. Invoca is a third party wiretapper because it has the capability to use the contents of conversations it collects through the Services for its own purposes, other than simply furnishing the recording to its clients, such as DirecTV. *See Javier v. Assurance IQ, LLC*, 2649 F. Supp. 3d 891, 900 (N.D. Cal. 2023); *see also Yockey v. Salesforce, Inc.*, --- F. Supp. 3d ---, 2023 WL 5519323, at *5 (N.D. Cal. Aug. 25, 2023).

59. At all relevant times, through the Services, Invoca violated the first prong of CIPA § 631(a) by intentionally tapping, electrically or otherwise, the lines of telephone communication between Plaintiffs and Class Members, on the one hand, and DirecTV, on the other hand.

60. At all relevant times, through the Services, Invoca violated the second prong of CIPA § 631(a) by willfully and without the consent of all parties to the communication, or in any unauthorized manner, reading or attempting to read or learn the contents of electronic communications between Plaintiffs and Class Members, on the one hand, and DirecTV, on the other hand, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within the United States or California.

61. Invoca failed to inform Plaintiffs and Class Members: (i) that Invoca, as a third party, was listening in on communications between Plaintiffs and Class Members, on the one hand, and

DirecTV, on the other hand; (ii) that Invoca, as a third party, was tapping or otherwise making an unauthorized connection with Plaintiffs' and Class Members' conversations with DirecTV using the Services; and (iii) that the content of Plaintiffs' and Class Members' communications with DirecTV were being recorded, collected, intercepted, and analyzed by, Invoca, a third party.

62. Accordingly, neither Plaintiffs nor any Class Member provided their prior consent to Invoca's intentional access, interception, learning, recording, and/or collection of Plaintiffs' and Class Members' oral communications with DirecTV. *See Javier*, 2022 WL 1744107, at *2 ("[W]e conclude that the California Supreme Court would interpret Section 631(a) to require the prior consent of all parties to a communication.").

63. Invoca knows it is a separate and distinct third-party entity from DirecTV customer service agents, the consumers speaking with DirecTV, and the conversations at issue. Invoca knows it is eavesdropping upon and recording conversations to which it is not a party.

64. Because Defendant is headquartered in California, a CIPA § 631 can be pursued by all individuals whose oral communications to DirecTV customer service agents have been intercepted and/or collected by Invoca nationwide, regardless of where the individual resides. *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, 2016 WL 3543699, at *6 (S.D. Cal. June 29, 2016) (finding that non-resident plaintiff had statutory standing under CIPA where recordings by California defendant took place in California); *see also Carrese v. Yes Online Inc.*, 2016 WL 6069198, at *4 (C.D. Cal. Oct. 13, 2016) (same and noting that "[c]ourts have declined to read CIPA's legislative intent as a limitation on standing when the statute does not impose any residency requirements"); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011) ("A legislative purpose that articulates an interest in protecting those within California is not inconsistent with also allowing non-Californians to pursue claims against California residents.").

65. The violation of CIPA § 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

66. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Nationwide Class and California Class have been injured by the violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Invoca's violations of CIPA § 631(a).

**<u>COUNT II</u>**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632(a)**

67. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

68. Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Class and California Class against Defendant.

69. CIPA § 632(a) prohibits an entity from "intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio." Cal. Penal Code § 632(a).

70. Invoca's Services are an "electronic amplifying or recording device."

71. At all relevant times, Invoca intentionally recorded the confidential communications of Plaintiffs and Class Members.

72. At all relevant times, the communications between Plaintiffs and Class Members, on the one hand, and DirecTV, on the other, were confidential. Communications entail discussions of financial information for payment processing, and other forms of information required for the purpose of identity verification.

73. When communicating with DirecTV, Plaintiffs and Class Members had an objectively reasonable expectation of privacy. Plaintiffs and Class Members did not expect that Invoca, an unknown third party, would intentionally use an electronic amplifying or recording device to record their confidential communications.

74. Plaintiffs and Class Members did not consent to any of Invoca's intentional use of an electronic amplifying or recording device to record their confidential communications.

75. Because Defendant is headquartered in California, a CIPA § 632 can be pursued by all individuals whose oral communications to DirecTV customer service agents have been unlawfully recorded by Invoca nationwide, regardless of where the individual resides. *See Bona*

*Fide Conglomerate, Inc.*, 2016 WL 3543699, at *6; *see also Carrese*, 2016 WL 6069198, at *4; *Valentine*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011).

76. The violation of CIPA § 632(a) constitutes an invasion of privacy sufficient to confer Article III standing.

77. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Nationwide Class and California Class have been injured by the violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Invoca's violations of CIPA § 632(a).

**<u>COUNT III</u>**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 637.5**

78. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

79. Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Class and California Class against Defendant.

80. Under CIPA § 637.5(a)(1), "[n]o person who owns, controls, operates, or manages a satellite or cable television corporation, or who leases channels on a satellite or cable system" shall "[u]se any electronic device to record, transmit, or observe any events or listen to, record, or monitor any conversations that take place inside a subscriber's residence, workplace, or place of business, without obtaining the express written consent of the subscriber."

81. Further, "[a]ny person receiving subscriber information from a satellite or cable television corporation shall be subject to the provisions of this section." CIPA § 637.5(h).

82. DirecTV is a "cable television corporation" because it is a "corporation or firm which transmits television programs by cable to subscribers for a fee." Cal. Pub. Util. § 216.4 (definition of term incorporated by CIPA § 637.5(f)(1)).

83. Invoca's Services constitute an "electronic device" for purposes of CIPA § 637.5(a)(1).

84. Invoca is a separate legal entity that offers "'software-as-a-service' and not merely a passive device." *Saleh*, 562 F. Supp. 3d at 520. Accordingly, as a corporation, Invoca is a "person" for purposes of CIPA § 637.5(h) as defined under CIPA § 637.5(f)(3).

85. At all relevant times, through its Services, Invoca received subscriber information from DirecTV—including Plaintiffs' subscriber information—by using Invoca's Services to listen to, record, or monitor conversations that took place inside a subscriber's residence, workplace, or place of business when consumers would call DirecTV.

86. Plaintiffs and members of the Class did not consent to any of Defendant's actions discussed above.

87. The violation of CIPA § 637.5 constitutes an invasion of privacy sufficient to confer Article III standing.

88. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Nationwide Class and California Class have been injured by the violations of CIPA § 637.5, and each seeks statutory damages of $5,000 for each of Invoca's violations of CIPA § 637.5.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Classes, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d) For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: May 29, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Julia K. Venditti*

Julia K. Venditti (State Bar No. 332688)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC**
Adrian Gucovschi*
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Email: adrian@gr-firm.com

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs and the Putative Class*